Docket Numbers 22-13-18, 13-62, and 13-86. State Farm Mutual Automobile v. Triborough, New York Medical et al. And why don't we start, let's see, we have Attorney Strolley? Yes, your honor. Did I get that right? You did, it's actually Strolley, it's been Americanized over the years. Strolley, okay. Attorney Strolley, and you are asking to reserve one minute for rebuttal, is that right? Yes, your honor. Okay, let's proceed. May it please the court, Peter Strolley from the law firm of Kaufman and Dolowich, representing the Metro Pain appellants, cross appellees. This appeal concerns the injunction of defendant's right to arbitrate and seek prompt resolution of 9 million in unpaid claims in a protracted recall action, which after two years is still in written discovery. By now, many of the policies, which are the only source of payment, have been exhausted. Can I begin with a question about our appellate jurisdiction here? Yes. We have a couple of cases where by summary order, not in a published opinion, we dismissed as moot appeals from a preliminary injunction where the complaint had since been amended, and an amended complaint filed. And doing some research, it turns out that some of our sister circuits seem to be very strict about a rule that that is an absolute. The appeal is moot because the complaint on which the preliminary injunction was based is now a nullity and superseded. Do you have any thoughts on that issue? None other than from an equitable basis that it's been two years, and to put off any longer the ability of defendants to obtain any relief in the form of payments on these policies. Yeah. Would pretty much make a nullity of the motion. Yeah, problem is that's, I understand that's sort of a basic fairness equity issue, but I think what we're talking about is subject matter jurisdiction, which is much more of a formalistic thing, right? We don't exercise subject matter jurisdiction when it seems like a good, fair thing to do. Right. We understand that this is an issue that wasn't raised in the briefs. Right. Maybe what I could suggest, if it would be agreeable to the panel, because we are hitting you all with this, is perhaps if each of you could file something, offer whatever thoughts you might have, if you have any thoughts today, that's fine, during our argument. But maybe by, what did we say, next Friday? Yeah. A letter not to exceed three pages each. With any views you might want to share with us about whether the situation posited by Judge Lynch undermines our appellate jurisdiction, that is the filing of the second amended complaint. Does that have any impact on our appellate jurisdiction to review the preliminary injunction which was entered, as I understand, based on the first original complaint? Right. Does that make sense? That makes sense, Your Honor. Okay. We can turn to the other issues, though, that you are all prepared to argue today. Right. Yes, Your Honor. The district court's finding of, let me start with irreparable harm, which is the most important element of an injunction, preliminary injunction. The district court's finding of irreparable harm was based on unsupported speculation regarding the risk of inconsistent results if the injunction were denied, and state farms purported hardship of having to waste time and resources in the meantime. This court rejected the same assertion of irreparable harm in Allstate versus Harvey Family Chiropractic. If you compare the judge's decision at pages 42 to 45 of the supplemental appendix, and Allstate's brief in that case, they're virtually verbatim on the issue of irreparable harm. And this court held in that, it was a summary order, I should say. There is no evidence in the record that upon the conclusion of this matter, the plaintiffs cannot be fully compensated through money damage. Mere injuries in terms of money, time, and energy absent a stay are not enough to establish irreparable harm. What about the question of preclusive effect of these other proceedings? I thought that was something that was not considered in the, whatever the name of that summary order is, was it Harvey? That's correct. I thought it was only about money that was at issue there, the question of, look, money now, money later. It's just money. Well, I think the quote that involves the decision below and in the Allstate's brief is that, when you have a mix of arbitrators, it can result in contradictory holdings. But I think as the court held, and I think it's Liebowitz versus Smith-Barney, the preclusive effect is still a question of speculation. That at the end of the day, the court below will reach a decision that is going to be inconsistent with the underlying arbitrations and state court proceedings. And the problem they have is, all they're relying on in terms of these arbitrations is a two page affidavit. Which all it tells you is the number of arbitrations and the number of state court proceedings. With respect to my client, who has 30 clinics, doesn't even tell you out of the listed arbitrations, which ones concern the four clinics at issue in this case. So it's an inflated number that the judge is relying on. Well, I'm not sure that answers Judge Nardini's question. So let me try and pose it more differently, anyway. The question that I think we're concerned about here is, so an arbitrator comes back with a decision, it's in your favor. Let's assume, and I'm sure you hope and trust it won't be the case, but let's assume that State Farm prevails in demonstrating that this was all a gigantic RICO enterprise and that these bills were fraudulent. Are you going to be then in a position to claim that, well, that's all well and good. But actually, you can't get the money back because there's a preclusive effect that comes from the arbitration. We have not argued that there would be a preclusive effect. You haven't yet, because it hasn't happened yet. But it's something we need to be concerned about. Are you telling me that you don't think there would be a preclusive effect, or you're not going to ask? I don't see, based on the record, how there could be, because these arbitrations are not based on fraud. They have not asserted fraud in these arbitrations. So if there's a finding on fraud, and all of these are fraud-based claims in the RICO action, and there's an arbitration that deals with medical necessity, the two things aren't necessarily contradictory. Okay, fair enough. Well, let me, okay, I guess I'm not exactly sure how that's necessarily the same, because it seems like one of the arguments they're making is there was no medical necessity. They have this whole kickback scheme in place so that hundreds or thousands of medically unnecessary procedures are occurring. And they are fraudulent by virtue of the false certification to the insurance agency that they were medically necessary. Basically, there's a lie to the company, but the lie is about whether they're medically necessary. And I suppose one of the ways they're going to try to prove that, and maybe they'll succeed and maybe they won't, is that, well, 9,000 people walk into a clinic and they all get the same diagnosis, give me a break, right? So, but it would seem to me that if I were in your shoes, I would want to push forward with the arbitrations, win on the question of medical necessity, and then defend myself in the civil RICO suit by saying, wait a minute, wait a minute. What do you mean pattern of submitting false claims? I've got 500 arbitration decisions that all show that every one of these patients underwent a medically necessary procedure, and that dramatically undercuts your claim state form, that I have a pattern of submitting medically unnecessary procedures. So what I'm wondering is, why would you not want to use those? Assuming you could get those results in arbitration, why would you not want to assert perclusive effect? Well, it's kind of hard to argue this in a vacuum without an actual decision, but as I understand the arbitrations, they're based on claim by claim by claim basis. Sure, but again, if they have, they're going to try to say, look, you, and I mean you, whatever, the plaintiffs, or the defendants. Submitted 1,000 claims, all these people are always diagnosed the same. That must prove that these are medically unnecessary. And if you instead could come back with, say, 500 arbitral decisions saying, well, you claim that they all must be the same. But I've got 500 arbitral decisions saying that as to 500 patients, all this stuff was medically necessary. That takes all the wind out of your sales state form to say that these were all frauds and claims, because in fact, the bulk of them were fine, as proved by arbitrators. Well, I think that argument actually is going to be made in the RICO action, because they're basically, if you can't shoehorn these cases into a RICO action in terms of medical necessity, you can't- Well, right, but my point is, right, it would be better for you, instead of having to put up 1,000 doctors and 1,000 nurses and 1,000 MRIs and x-rays to show, no, look. Victim number one, he actually had a broken neck. Victim number two, he really had a, whatever, medical issue, right, and prove them all. You could just put in 500 arbitral decisions, saying, well, they're not even allowed to argue that these weren't medically necessary, because they and we duked this out before an arbitrator, and we won. End of story. We don't need evidence. We fought the evidence in another forum, and we already won on 500 of these. Right, I mean, why would you not make that argument? And I'm not suggesting that you can't make that argument. Right. What I'm just suggesting is, I don't understand why you wouldn't make that argument. And are you telling us that, well, you might be telling us, A, you wouldn't make the argument, which would be sort of surprising to me that you would be, and I'm not saying you have said that, but it would be surprising you would say that. Or are you saying that you couldn't make the argument that, no, in fact, these would not have preclusive effect in the RICO? You haven't said either of those things. Well, I think, Your Honor, I would make whatever arguments I have available to me, obviously. So that's, I think we're coming back to the question that Judge Lynch and I have been probing is, then explain why, assuming that you want to retain the availability of a preclusion argument, why that doesn't constitute some sort of irreparable harm to state farms, unless you're telling me that they could, through the civil RICO, they could undo the arbitral decisions, or they could second guess them, or that they wouldn't have preclusive effect? But again, it seems to me you're going to be arguing they do have preclusive effect, and if they're preclusive, why is that not irreparable? Maybe that's- I guess the way I'm looking at it is, the claims in the RICO action are all fraud based. Now the medical necessity is something that you need to determine on a patient by patient basis, which is something we'll also argue in the RICO action, that you can't just base it on statistics. As the Maryland court recited, statistics require context, of which none is provided in this two page affidavit. So as I see it, they're apples and oranges. You're talking about medical necessity of a particular patient on a particular claim. And in this, you're talking about fraud based claims when there's nothing in here, this two page affidavit that tells you any of these arbitrations are going to have a finding on fraud. And as Judge de Arce Hall- But you're saying that that's the only way they could have preclusive effect? Is if the arbitrator says, yes, there's fraud, or no, there was no fraud? Well, I think under collateral estoppel that would be true, but maybe there could be a res judicata argument. Because you have to raise anything that was necessary that you could have raised in that proceeding. That's kind of my point, right? If they're strategically not raising a fraud objection, because they are hoping that that will vitiate the preclusive effect. But you're going to say, good luck to you, you strategically chose not to raise it. You could have raised it, you didn't, and you know what, God bless you, you made that choice. But you know what, now you're going to have to live with the preclusive effect of the arbitration. I see your honest point, but I still think that's very speculative basis for irreparable harm, which requires something that is actual and imminent. Not something that at the end of the day of a six year probably RICO action, which by that point the policies will probably all be exhausted, so it's going to be pointless. And by the way, none of these medical providers can survive a litigation. As Judge Gotell held in the Hartnett case, the whole purpose of the option to arbitrate in no fault cases is to address the unequal bargaining power between the insurer, you're a $16 billion company, and the medical provider. Yet the court below, and many courts in the Eastern District, have gone out of their way to create exceptions on behalf of the insurer. Yeah, maybe that's because they've had a lot of experience with criminal RICO cases that make exactly this claim. And maybe they're a little burned by how the medical providers in the Eastern District of New York have operated. I think your honor may be accurate, but that still doesn't mean- But that's not you, your clients have not been criminally prosecuted, I think. That's true, and the standard for a preliminary injunction, it's supposed to be only the last resort in the judicial arsenal of remedies. And it's never supposed to be routinely granted. But in these cases with medical providers, it's almost automatically granted. I was saying with this- I kind of got a sense that the case law is very mixed. That, I mean, sort of your point in Harvey, right? They didn't grant it, right? Right, Harvey, this court in Harvey was clear, but when you look at the string side of cases in the decision below, dismissing Harvey out of hand. You get a sense of the problem. They're parroting each other, saying Harvey has no bearing because they didn't deal with the risk of inconsistent results. You dig into Harvey, and that was precisely the claim of irreparable harm. Yeah, where do, and I know it's a summary order, it doesn't bind us at all. The only line I saw in Harvey that could vaguely be read to perhaps be addressing that, is the last line, which is sort of a catch all, after they talk about irreparable harm and money. Look, money is money, money is fungible, you can get money now, you can get money later. But it then says, nor is declaratory relief sought by the plaintiffs threatened by the other proceedings. Is that where we sort of embedded the discussion of inconsistent results? It's sort of, and nothing else. Well, I understand that Harvey doesn't go into the facts and what the claim of irreparable harm was, but that was the claim of irreparable harm. And the court found, based on that finding of irreparable harm, that there wasn't irreparable harm because there's nothing to show at the end of the day you can't get money damages. And insurers' waste of time and resources is not irreparable harm. Okay, I think we've kept you up here for a fair amount of time, and thank you for that. Unless there are any questions right after the bench, we'll hear from you again for a minute of rebuttal. Why don't we hear from your colleague, Attorney Roberts. Good morning, judges, good morning, your honors. Keith Roberts on behalf of the Elan Defendants, Brock Eichler, Roseland, New Jersey. Thank you for the opportunity to argue today. Your honor, I'd like to address your question, if I may, that you had posed earlier. I think it's absolutely clear that there is positively no preclusive effect in a situation where a carrier would move under RICO, and whether it be, sometimes in these jurisdictions in New York, they are able to apply the New Jersey Insurance Fraud Prevention Act, the most robust Fraud Prevention Act statute in the country. The law in New Jersey is very well developed in this area, less so in New York. But Munn makes it very clear, Fed 3rd 94214, reading from 99 and 100. The New York No-Fault Reparations Law is in no way intended and should not serve as a bar to subsequent actions by an insurer for the recovery of fraudulently obtained benefits. Now, this is explained in detail. They actually cited the Department of Health in New York in a letter from Lawrence Fushberg, supervising attorney, which explains the interplay, which, although complicated, is actually simplistic in its principle. The interplay between these separate bodies of law are very clear. One is a reparations law that's first party benefits intended to resolve those claims for the consumers and the injured and the people who reserve the healthcare benefits expeditiously. Based upon a very limited amount of discovery, if any, and a weighing of medical evidence heard by individuals that are particularly experienced to do so. They're not prevented in those situations from bringing forth, hey, by the way, look at that. They are not prevented in those circumstances in arbitration from bringing forth documents that say, hey, look at this. This is pretty suspicious about other things that are happening at this clinic, etc. They're not prevented from asserting those defenses. You're saying asserting those defenses in the arbitration. They are correct. They are also not prevented, and Munn makes entirely clear. Again, this area of the law is developed a lot further on the other side of the river, where I happen to resign. Thank you for being a guest today. That there is an intentional division here. One is the first party benefit reparations law to deal with these claims expeditiously. They are expressly preserved. Munn makes it very clear. It's all laid out. This is how these two separate areas are handled, and there's good reason. There is a regulatory scheme that's set up in New York, the same in New Jersey, where the insurers have available to them fraud reporting requirements, SIU investigations. They're required by statute to set up these types of investigatory processes and report on them to detect fraud, which is in the public interest, deter it, and prosecute it. They're therefore not barred or rammed into a limited discovery expeditious proceeding solely to resolve a first party benefit on a medical bill. That's not how it works. They can go later on and assert all those claims within the statutory period and not be barred and not be precluded. Restricted wouldn't apply. That is how the law is intentionally evolved, and it's laid out in Munn very clearly. So just clarify for me. Yes, sir. You're saying that, hypothetically, there's one of these arbitrations initiated, say, by one of your clients, because it hasn't gotten paid. Insurance company comes in to that arbitration and says to the arbitrator, we think it's fraudulent. Arbitrator decides, I don't know that it's fraudulent, I'm going to order that it be paid. Are you saying that they still have a vehicle outside the arbitration to challenge the fraud finding? I'm absolutely saying that, and I believe that is the law in New York, and I believe that law is also highly developed in New Jersey. So the arbitral decision, finding no fraud, is not binding. It has no preclusive effect. No preclusive effect on their ability to pursue, by law in New York, as detailed in Munn very clearly, their claims under RICO. And other claims for fraud. It's not intended to be preclusive. It's intended to resolve first party benefits on an expedited basis for the consumer who paid for the policy premiums and who's injured in a motor vehicle accident. I think Munn does an excellent job of laying it out. And that is my position. And for good reason, because the court's concern is obvious to me. If we can't have, right, we can't have providers who may be engaged in a fraudulent scheme, knocking down arbitrations one after another successfully, and turn around saying, hey, these people are now precluded from suing me for fraud. That's not the law, and that's not how the law's evolved. So I wanted to address the court's question on that issue. Your Honor, although I agree with Harvey, and I agree with, I believe it's very well reasoned, and I think it's on point to a certain extent. There are some issues with it in terms of how that record was developed. Pivoting away from Harvey, my position with this record for this case, for these defendants, the clients I am representing, what we have here is, there's well settled law in New York, beginning all the way back in 1960 with Dior, that F sub 190 F sub 394, you have to have competent evidence before the court. Whether by way of affidavit or testimony, and if we're going to pivot, as the court did in its opinion, and for the record, the court pivoted away from that body of law, which is well developed in New York, about the competence of the evidence on the return date for a preliminary injunction. At marker ID here, page number 3882, in the record, and 3883. The court's opinion on page 39 and 40, clearly pivots away from that and said, look, we're going to rely only on the pleading. Now the court had to do that because in this particular case, State Farm provided, and there's no good explanation for this. These are sophisticated litigants. Let's make no mistake about it. These records are usually very well developed. They are funded by long standing investigations that are handled by experienced investigators. There is highly experienced counsel that practice almost, many of them practice almost exclusively in this area. And there's no explanation as to why the investigator, Babin, really gives us nothing. I mean, he tells us there's a lot of arbitrations and we owe these people a lot of money and they want a lot of money. That's really all he says, and I'm not being cute. I've read this multiple times. It's nine paragraphs. He doesn't give me anything. He doesn't give me anything on, first off, we have about 50 defendants in this case, probably 60, I don't know. But over a period of the course within the statutory period, even 150 arbitrations per defendant. There are tens and tens and tens and tens of thousands of arbitrations filed in the state of New York. Not much different across the river, it's more robust here. Concerning the highly contested area about dispute of these benefits. These claims are often denied in motor vehicle accident cases for right or for wrong. It's the culture. These cases go to arbitration in vast amounts. These numbers are conflated intentionally to shock the court. They're not shocking. You have a huge amount of defendants here. You're going to have denied claims. Claims are going to go to arbitration. And we have a massive amount of defendants. And over the statutory period of time, we're not looking at a lot of arbitrations per defendant. We don't even have a breakout. We don't understand what the cases were about, what the issues were in those cases. So nothing is provided substantively by affidavit as to the competency of the proofs upon which the pleading rests. What we do have, what we do have and which the court recognizes is, hey, there's a lot of argument from the lawyers in the pleadings. Lawyers drafted the pleadings referencing appendices which say, hey, here's two examples of a fraud. And this was borne out now by a chart and all these proofs. I mean, these are conflated. We haven't had the ability to examine the competency of these proofs at all. So what the court did was really essentially, and in my opinion, respectfully, erroneously, relied upon the pleading only. But what happens is, when the court does that in its opinion on page 39 and page 40, it then turns around and pivots to away from Dior and a long line of cases since the 60s that talk about the importance of the company of the proofs. And pivots to essentially four cases. Geico versus Advanced, all right? In Geico versus Advanced, the court had it before it, a declaration from a board certified pain management physician who examined the proofs. That's competent evidence. Geico versus Zaitsev. They had an affirmation from a physician who was working inside the clinics that had knowledge to impart to the court about the fraudulent scheme concerning the corporate structure. Competent evidence. Geico versus Stud. Admissions and guilty pleas. Don't need to say anything more about that. State Farm versus Parisian, okay? The SIU investigator did in that case what the SIU investigator did not do in this case. Provided a detailed analysis about how the investigation was carried out. Laid it all out for the court. Explained the investigation in detail to include how the defendants disintentionally thwarted the effort of the insurance company to stifle the investigation by not showing up for examinations under oath, etc. I think we understand your point. You've explained it well. Thank you. Before you sit down, and you can address it now, or you can address it in rebuttal. And I'll give Mr. Strolley a chance, because we're going to ask the other side. I would be very interested in all counsel's thoughts on the statutory question about the applicability of the FAA here. In terms of whether it bars an injunction. Yeah, maybe I could give you a starting point for that. First of all, I very much appreciate the way this argument has gone because I think it is very informative to look at this case through the lens of the regular standards for a preliminary injunction. But you've also made arguments that go to the heart of the whole thing, that whatever their proof, they shouldn't be getting the kind of injunction that they're asking for. So with respect to the FAA, for example, I don't see anything in the FAA, it's very detailed about what you have to do when somebody comes and wants arbitration, or when somebody comes and tries to enforce the result of an arbitration. I don't see any equivalent of the Anti-Injunction Act in the FAA. There's no explicit- I agree. There's no explicit statement. So where do we derive the notion that because Congress is emphatic that arbitration clauses are valid and can be enforced? It doesn't say much about anything like this, where somebody's coming in and saying these arbitrations result from some kind of fraudulent scheme and they should be enjoined. From the beginning of the republic, there's been a specific thing about when you can and can't enjoin state court proceedings, but I don't see any body of law or anything in the FAA that talks about that with respect to arbitrations. So can you tell me where this all comes from? Or in your view, where it doesn't come from? Yeah. I think the proper analysis is what I've been advocating to the court. I think this case does not turn on the application of the Federal Arbitration Act, this decision. Okay? I don't believe it does, truthfully. I think it turns on what I've been advocating to the court, which is why I advocated the way I did. It's about the competency of the proofs that are missing. It's about, you know, and listen, I have, for what it's worth, I have some experience in the practice area. It's extensive, actually. And we're pivoting away in New York in the Eastern District from common law and case law that requires evidence and that requires competent proofs. And I'm sorry, but it's harder to find a decision, respectfully, your honor, in the Eastern District that doesn't grant the injunction. And I know because- Judge Kogan, the way I saw it, other than, I don't remember- I mean, we're familiar with all of them. Our papers may have, I can tell you my papers will look different in this case, but you know- But there are several judges in the Eastern District who have entered this kind of injunction at the behest of insurance companies. And I've forgotten who was the judge in Harvey. Judge Kogan wrote an opinion that went the other way and bucked the trend. So there is a diversity of view. And after all, that's why we're here, is to sort out possible errors in the district court. Amen to that. And whatever they do, they do. And it's interesting, and we read their opinions respectfully. But it can be ten to one, or just like the Supreme Court doesn't care very much what the courts of appeals say. It can be 13 to nothing, and they say you're all wrong. We're focusing, yes, I'm sorry. And we're not bound by a majority vote in the Eastern District. Forgive me, I didn't mean to interrupt. No. Focusing on the proofs in this case, and how it was presented. What we really have is essentially a complaint that was put together by counsel. And an affidavit of the investigator, for reasons that are not explained, provides us with really nothing. And I think you've argued this point, and I think we understand it. So I'm going to thank you, and let's say we'll come back to you. We'll have one minute for rebuttal. Why don't we hear right now from counsel for the appellee, and again, Attorney Smith. The floor is yours. Thank you. Judge Lynch, in response to your question about subject matter jurisdiction, I'd prefer to address that in the letter that the court has contemplated. Fair enough, because we're taking you by surprise. And let me tell you, I came upon this issue in my researches right before Christmas. And I deliberately said, let's not ask them to brief this now, which would get it efficiently done at oral argument, because it would ruin their Christmas. We'll just ask them if they haven't thought about this before, they can write briefs afterwards. So I'm on board with that. Very kind of you. May it please the court. Could you, at this point, though, give us a very brief indication of how the amended complaint differs from the original complaint on which the injunction was granted? Be happy to do that, Your Honor, and I want to emphasize an important point on the amended complaint. Principally, what the second amended complaint did was add additional parties to the lawsuit. It also adds more details, and in addition, we included sworn declarations and swearing to the exhibits that are attached, including the details claims data, the fact that this is pre-grant treatment, and everything else. That's in the district court record at, I believe it's 311 through 313, so you can see those detailed affidavits and sworn proof. But that's the principal way in which that complaint differs from this one. But that's a great pivot to what your adversaries have been talking about. They say that you didn't do any of that in the actual application for the preliminary injunction based on the initial complaint. So, there are a lot of interesting issues here about the Anti-Injunction Act and the Federal Arbitration Act. We didn't hear anything about that from the other side, even when we asked. The principal argument there is, regardless of that, assume that a district court has total power to enter the exact injunction you want in an appropriate case. They are principally relying here. I don't suggest they've abandoned any other arguments. But they're principally arguing here that you just didn't make the case, because there is not evidence. There has not been what typically happens in preliminary injunction cases, where there's a little hearing and somebody gets on the stand. Or maybe you don't even need a hearing, because there's a lot of affidavit proof that isn't contested. So how did you make the case for likelihood of success on the merits and irreparable harm in the district court? Sure, so the district court's decision is founded on the flexibility that's imbued in district courts under the sufficiently serious questions going to the merits doctrine. That doctrine has never required evidence that I've ever seen. The complaint here is incredibly detailed. It's not a real- It's a bare-bones complaint. It's not a bare-bones complaint. And in fact, the supporting exhibits include detailed claims data, which, as I've explained, has since been sworn. And in addition, exhibits demonstrating a pre-can treatment protocol here. There is a lot of evidence that has since been uncovered during discovery. I understand it's not in the record, but there are affidavits and declarations from physicians swearing that lay people were directing them to give pre-canned treatments. There's evidence of payments to shell corporations associated with defendants who have since been indicted by the feds for bribing ambulance dispatchers and the like to secure patients for this scheme. So there's a lot of evidence on the merits here. As far as irreparable harm is concerned in this case, we think we've shown at least three forms of irreparable harm. I think one of the cleanest forms of irreparable harm that's at issue in this case is just the irreparable harm that comes from responding to 3,000, and with the new defendants in this case, 4,000, separate arbitrations and lawsuits that are being pursued against State Farm. I will note also that my adversaries aren't pursuing an efficient path to arbitration or lawsuits in these cases. It's hard to consolidate these- Can we just back up for a second? Articulate for me what is the irreparable harm. Sounds to me when you say I have to respond to 3,000 to 4,000 perpetrations. That's another way of saying, I am going to incur incredible outlandish astronomical costs. But why are those costs or harms irreparable? Because in general, when we say your harm is monetary, we say, well, that's why you sue people and get money in the end. Now, I suppose you could make an argument that they're judgment proof, or they're going to be judgment proof. And they're going to run the costs up so high that you're going to incur costs far beyond anything you'll ever be able to recover. But I don't think I have heard that, the argument that's being made, or that there was a basis for it. Is there something, is that what you're arguing, or is it a different argument? No, I think we've covered, we cover in our briefs, and there is sufficient support for essentially all three. I mean, Judge Kears wrote her decision in Dunziger that found that latter situation. A situation where the strategy was to inundate Chevron with a bunch of lawsuits, and then essentially there would be no way to recover by Chevron. So that's, it's not just, you're not just arguing the sheer number of arbitrations, but you're arguing that the costs will far exceed your ability to recover. Yes, that's right, and they have submitted affidavits that show from a cash flow perspective, they spend what they take in. So even in absent an injunction, we're giving them money that we're never going to see in return. But there's a threshold irreparable harm here that several other circuits have recognized. The idea of being inundated with 4,000 sham lawsuits is itself a form of irreparable harm. It's not just attorney time. It's time responding, being compelled to appear. There's no monetary substitute for peace, as one district court put it. And so the Fifth Circuit, the Sixth Circuit, the Eleventh Circuit have all found irreparable harm in this situation. The only reason why I can tell that this court hasn't addressed that issue is because, at least for a district court to protect its own jurisdiction, Judge Winter wrote, we're not going to wait for a private party to demonstrate irreparable harm. In that situation, a district court has inherent authority on its own to issue the injunction to protect its jurisdiction. And in part because of a concern that litigants wouldn't step forward in a particular case to ask for an anti-suit injunction. But there's nothing in that decision that suggests that it's not irreparable harm to respond to 4,000 sham proceedings. And so I think we've demonstrated irreparable harm on those bases as well. As for Harvey, this court's summary order is incredibly short. What I can- But that's one side of the issue. And when you're saying this is, we did not have to make a showing of likely success, because this is based solely on the fact that there's a fair ground for litigation. And that can be determined from the complaint alone. That's a reasonable argument. But then we're in the position of looking for particularly strong evidence of irreparable harm. And we're looking at the balance of the equities. And everything that you've just said can be countered by exactly the same argument on the other side. You are the big foot in the room. You've denied claims under a no fault insurance provision that is designed to expedite the processing of claims and the ability of injured parties to get immediate benefits and have an expedited arbitration proceeding. And you deny thousands of claims. That's how this starts. You denied 4,000 claims. That's why there's 4,000 arbitrations that are coming back at you on the other side. And I take Mr. Roberts to be saying, and this is not based on the record, but it makes sense to me, that actually, quite apart from frauds, there is a giant cottage industry, bigger than a cottage industry, of these arbitrations. Where insurance companies deny the provider objects, arbitrations happen. I take it not all of those are cases that you're going to say are fraudulent. They don't all involve these people or anybody else that you've sued. And everybody's out arbitrating all the time. On their side, if that arbitration process is cut off and they don't get to bring claims, then they go bankrupt. That's what they're saying. So once we take out the, look, we're going to win this case because these guys are fraudsters and we've given a preliminary proof to the district court to show that, it gets a little harder for you, doesn't it? Well, I don't think you can take that out of the case. I think this court sits in review on an abuse of discretion standard for a reason. District courts in the Eastern District of New York see these cases and they can be trusted to make a determination whether or not a showing is sufficient to demonstrate the fraudulent scheme that is at issue here. And so in that situation, I haven't seen any argument that no reasonable jurist could come to the decision that Chief Judge Brody came in this case. And if there is a situation like that, they can take an expedited appeal, they can seek a stay pending appeal, etc. There's interlocutory remedies for this court to police it. But on the facts of this case, there is no abuse of discretion that I've seen. That is, by the way, another way that this court can distinguish Harvey. In Harvey, the district court denied a preliminary- Yeah, there we were affirming. And then I just looked it up, it was Judge Johnson. So Sterling Johnson and Judge Kogan were the two judges who went the other way. And I forget what the roster is, but there are three or four, there are like five cases from three judges or something like that on the other side. So there is some difference of outcome in the Eastern District on this type of case. Yes, and the fact that you are seeing injunctions that are entered in this situation, though, I don't think that that is a indictment that it is easy for insurers to bring this case. And I want to dispel that notion, and I will. I think what it says is that there's rampant abuse of the no fault system. District courts confronting this, they're being careful in their decision making, and they're deciding that the insurers haven't made a sufficient showing. And there's a number of aspects of what's going on here that I think shows that district courts should be given that flexibility and that responsibility. One of the things about the claims that you mentioned, it's three or 4,000 claims. They would say that they're just denied, and it was a point that I was attempting to make a little bit earlier. There's no efficiency to how they're pursuing these claims processes. Even though no fault actions, it's difficult to consolidate them. You can bring a no fault action involving a single patient for all the treatment that has been provided. That's not what they're doing here. They're bringing a no fault action or bringing an arbitration over one day of service or one bill. And they're doing it repeatedly. So for one patient, you could have 20 actions. And the whole point- From the same provider? From the same provider or other providers. Or are we talking about from related providers here? Either way, you can either chop it up by provider- I'm not saying what they could do. Are you saying that there's a specific allegation that a specific provider has chopped it up? I'm saying that there is evidence that they are chopping up their claims. That's what I'm saying when you say they, I just want to make sure that I understand what the antecedent to that pronoun is. Both that providers are bringing their own claims, but that individual providers are also essentially dissecting their claims and bringing- Okay, where in the record would we find an example of that allegation? I'll try and find record support for that, your honor. I understand- You can do, I don't expect you to have a page number at the top of your, you can include a footnote in your supplemental- Yeah. Letter about the jurisdictional thing with just a note as to where we can find that. I believe we can find it in the evidence of the charts with the various different arbitrations and proceedings that we showed. Okay, it's a citation to the record, page numbers, and that's fine. I don't expect you to have that at the drop of a hat. Sure, but the point being that there's no attempt here, if this was legitimate practice and it wasn't to inundate my client with sham lawsuits, they would want to keep their costs down as well and not pursue these in the piecemeal fashion that they are doing. The only thing that we can tell from this court's decision in Harvey is that it discussed the underlying fraudulent insurance claims, which were compensable through money damages. And then there was a citation to Jayaraj versus Scapini, which says that injuries in terms of money, time, and energy are ordinarily not subject to preliminary injunctive relief, but there's a big if clause there. If they can otherwise be compensable at the end of the case, and in that case, you had an employee who, a public employee, who alleged that he was wrongfully not renewed. And what this court said is that that employee can receive back wages and potential reinstatement at the end of the case. Here, the irreparable harm to State Farm is threefold. It is the nuisance value of responding to 4,000 proceedings. It is the potential for inconsistent judgments. And it's finally the risk that these defendants are not going to be able to compensate State Farm at the end for enduring this. And when you say the risk of inconsistent judgments, I want to be clear about that. I mean, I suppose there's no inconsistency at all if one arbitrator says, particularly if all the claims are broken up, this claim is not supported by medical necessity. And a different arbitrator says a different claim was supported by medical necessity. What I think we've been more concerned with is, is there some preclusive effect of that? In other words, so you win some arbitrations. Well, fine, then you haven't suffered any particular damage other than if you want to make a claim for all the attorney's fees or something like that. But you lose some, I think what we heard from Mr. Roberts was he thinks that the law is quite clear that you can then, in the RICO action, at the end of the day, if you prevail, essentially overturn those arbitral judgments and get your money back, is that your understanding or are you, because you weren't, I think you put inconsistent verdicts. You didn't say, and one of the irreparable harms is, we'll be forever precluded from getting anything back apart from the practical problem of they'll be bankrupt and judgment proof and we'll never get it back for practical reasons. Yes, so addressing that, your honor, there are a number of concerns that I have with Mr. Roberts' argument. First, there's obviously, there's the idea of claim preclusion that they certainly can argue, and at least one of the defendants has suggested that they would avail themselves of all arguments available. That we had an opportunity to litigate fraud that did not. The second is issue preclusion, of course. Finding a medical necessity, as Judge Nardini pointed out, would be waived in my client's face. There's the separate issue, too, that Judge Kearse is aware of between extrinsic and intrinsic fraud and how in New York law you can seek relief for that. For an intrinsic fraud such as this, submitting false documents, perjured testimony, what New York says anyway is that those need to be attacked at the rendering court through essentially a motion to vacate the judgment. There's also concerns that I have about proximate causation in our RICO case, whether or not they will argue that there's an independent third party actor in this case, a state court or an arbitral that will bless these decisions and break the causal link. That would also extend potentially to the common law claims. As far as MUN is concerned, all this court held in MUN was that the providers couldn't compel the insurer to litigate its RICO case in arbitration. That's it. So you had arbitrations and then you had, as in this case, you had an insurer that brought a RICO action and the providers moved to compel the RICO action into arbitration. And what Judge Jacobs said in that decision is no, they didn't sign up for that. They signed up to litigate your underlining claims through arbitration and you've done that. But here, they're bringing a RICO action. So I don't think you can read into that, that there's been a clear statement that there wouldn't be preclusive effect here. And again, we go back to, we're on an abusive discretion standard with a judge that's close to this case that made a rational decision under the circumstances. So we've demonstrated what I believe is serious questions going to the merits, irreparable harm, balance of the equities, which just leaves me with, and I do want to briefly address the Anti-Injunction Act and then the points on the FAA, I know I've gone well over, so. No, I think it would be helpful if you could spend a quick couple of minutes on the FAA question, even though we haven't heard that really from the inside, just a couple of minutes, yeah. Yeah, so on the FAA, Judge Lynch, you're right, I don't know that I see anything in the FAA that deals with preventing a district court from enjoining arbitrations that are essentially founded on fraud. Beyond that, though, is the district court recognized, the FAA applies to negotiated contracts. That was a throwaway line, wasn't it? I mean, we can write an opinion and say, well, we've got to really make sure that these people had a negotiated agreement. Come on, we've got to enforce it. But that doesn't necessarily mean that if negotiation was not at stake in that case, that that really was part of our holding as most simply just a descriptor. And look, there are a billion arbitration cases that insurance companies and the like are very eager to get enforcement of arbitration clauses where there are basically contracts of adhesion and nobody did any negotiating at all. It was take it or leave it, you hit the button on the shrink wrap for what you order online and so on. Arbitration happens when there is a contract. And this gives rise to a question because as far as I can see, there's no actual insurance policy in the record anywhere. But are you, maybe you can tell me where there is one, but the question is, I take it that New York State requires something to be in insurance contracts and there is in fact a clause in the no fault policy that references the right of the policy holder to arbitration. Is that, am I wrong about that? You're correct, but I would make a slight amendment to your statement. What New York's law says is that in these situations, a claimant has a right to demand arbitration. It's not necessarily in the insurance contract, it is a- But wait, no, no, no, I'm sorry, excuse me. Go ahead. Is it in the contract? I mean, they say there's a right. Now, it gets a little interesting if a state says, as to a certain category of case, we're going to close the courts and require people to resort to arbitration instead. Whether that is what the FAA is talking about. On the other hand, here, if it is in a contract, I mean, insurance is a highly regulated industry. Half the stuff that's in your policies is there because New York requires it to be there. And if you don't like those terms for doing business in New York, you don't have to do business in New York. And you come into New York, and you buy into New York's regulated insurance scheme, and you put in your contracts something that then the other side, by buying the insured, by buying the policy, also buys in to that set of terms. So I don't think it's as simple as saying somehow because the parties didn't, as happens in big commercial contracts sometimes, get together and decide, you know what? We'd really like to have arbitration. And one side says, well, I'd like to go to the AAA. And the other one says, I have a different arbitral body I'd like to go to. And then they negotiate and come, that doesn't happen in most arbitration clauses. That's correct, Your Honor, but they are making a decision by contract. What I will say is that there are not policies in the record here. What I will tell you, though, is- But is it a standard provision of all of your policies that references this statute, and tells the insured that you have a right to arbitrate? I'm not prepared, unfortunately, to address that. It's something that- You don't know that. Interesting. Okay. And I guess the other point I was going to make, which is very similar, but a little distinct, I think, from the one you were talking about with Judge Lynch is, it seems that you were arguing that state law requires the arbitration regardless of whether or not this is in the contract. That is correct. So my point would then be, doesn't your argument prove too much? Because then if you opted to put it in the contract when it was not required to be in the contract, you're the ones who brought it under the FAA. Clarifying- Because the FAA does not say, wherever arbitration is mandatory, the federal courts shall stand by to render assistance. It says, when a contract contains an arbitration clause, the federal courts will enforce it. So if you're the ones who stuck it in a contract when New York never said it has been a contract, just that you have to do it, then you are basically arguing that you guys opted into the FAA, right? I don't think it's- If, but again, that presupposes that it's in the contract, but you're correct that New York law didn't require you to put it in the contract. I think that the answer there, Judge Nardini, is that even if it's in the contract, acknowledging a requirement of state law when neither party could opt out of it, is not within the ambit of the FAA. I mean, I understand- You could opt out of it. You don't have to be here selling insurance to poor New Yorkers who rely on their state legislature's provisions of no fault. You come in here voluntarily, and you adopt, you buy into that system. This is not like you didn't consent to this. I understand and take your point, your honor. My point is that nobody on either side is freely agreeing to arbitrate. Well, but nobody's freely agreeing to, if you're saying that no one is freely agreeing on a point by point basis to everything that's in the policy. Because you take the whole thing, lock, stock, and barrel, one way or the other, right? You could say to them, I'm not issuing the policy to you. And they could say, well, I'm not buying insurance from you, right? It's consensual on both sides. It's only true what you're saying is nobody has consented to that little thing in the sense of no one has separately manifested assent to page eight, clause 16 of the policy, which is probably true. You could go by line by line, right? They didn't sit there and talk for an hour as they consented, and you didn't say to them. And as to the first sentence on the first page, we agree to offer you this. But neither party is not only just selecting the affirmative right to arbitrate. They're not dictating any of the provisions about arbitration. Those are taken off the rack from New York state regulations about what the form of the arbitration is. It seems to me that if you do have an argument on the FAA, the much stronger one would be something to the effect of what Judge Lynch was averting to. An argument could be, there's a federal anti-injunction act that says thou shalt not mess with state courts. But there is no provision in the FAA, right, that says if somebody is engaging in racketeering actions, thou shalt not enjoin arbitration. That arbitrations are not subject to some sort of extra shell of protection. Now, I think the argument on the other side would be, well, that's implicit because the FAA says if you've got an arbitration and somebody moves to enforce arbitration, that the court will enter an order saying, okay guys, go arbitrate. But that would be a different argument. Yes. So I guess I'm wondering, are you advancing the argument along the lines of what I think Judge Lynch posited, that arbitrations don't enjoy, by virtue of the FAA, the same level of protection from interference that state actions enjoy? Certainly, I think that this court can find authority in the RICO statute, for example, to prevent and restrain violations of that statute if there's a finding that the racketeering enterprise is abusing arbitrations as part of their enterprise. Just like they should enjoin any other contractual provision. If you had a contractual provision saying, you shall pay me 9,000% interest per month or I'll break your legs, you'd say, well, that's usury. That's loan sharking, that's extortion, and we can enjoin it, even though it's in a contract. And even though, I guess the argument would be if the FAA says this is an enforceable contract provision in general, but if there's a court finding that it's likely part of a racketeering enterprise, a pattern of racketeering activity, then all of a sudden it's enjoinable. That would sort of be the argument. Yes. Yes, Your Honor. One of the things about the Anti-Injunction Act, it's not just that it exists, and that gives a stronger basis for saying, don't mess with the state courts. It's also got exceptions, and the exceptions are a little opaque, and the Supreme Court has helped make it more opaque by splitting three ways in Vendo. But I think there's a pretty good argument that maybe RICO would be an exception, and you make that argument. But the FAA has suddenly then gets really vaulted, despite not having any such provision at all, into something where there are no exceptions. Or the courts have to make up the Anti-Injunction Act, and then they have to make up the exceptions. Yes. In order to work that out. It's odd to elevate arbitration that far. Agree, especially when there is an Anti-Injunction Act, and especially when, as we lay out in our brief, we have satisfied either of two exceptions to that Anti-Injunction Act as it exists here. And the only thing the district court did, it didn't quibble with our analysis under Mitch and V. Foster at all, it simply held that it thought that statutes had to have exclusive jurisdiction in federal court in order to invoke it, and that's of course wrong. Section 1983 gives rise to concurrent jurisdiction. Of course, they're the guys that I guess a lot of these questions really are being addressed to. Because you're perfectly happy if we decide that for whatever reason the FAA isn't going to save them from an injunction that would otherwise issue. That's correct. So we have kept you up for a considerable amount of time past the allocation. We thank you very much for your argument. I think we understand. We look forward to getting your supplemental brief. Why don't we just hear one minute each from each of the other sides. Thank you very much. Again, thank you very much. We're going to try to keep it nice and pithy. Yes. One minute. I'll do my best. Before I get into the FAA issue, there is absolutely nothing in the record that these are sham arbitrations. The only thing is a two page affidavit which tells you the number of arbitrations. If they thought these were sham arbitrations, you would think they would have at least raised the defense of fraud in a single arbitration. Am I right that the complaint on which this injunction is founded does not have a specific allegation that says the arbitrations and the lawsuits are fraudulent? You might say that's sort of implicit in the idea that the claims are fraudulent from the beginning. But there's not a specific allegation, but there is in the amended complaint. Is that correct? I don't think there is in either complaint. Okay. And getting to the FAA issue, it wasn't just Justice Kogan, it was also Judge Spratt in the Allstate-Alzanate case who held that the FAA Act, the Federal Arbitration Act applies to no-fault cases. Okay. Thank you very much. Let me just say that- No, no. I'm keeping it to a minute. So we're going to hear from your counsel, Mr. Roberts, now. One minute. Thank you very much. I guess we have gotten our money's worth out of all of you today. Thank you so much, Your Honor. And so have your clients. You can tell them what they want. Just briefly, going back to the issue about whether or not there would be a precursory effect. None is very clear on 99 and 100. No authority in the opposing briefs at all cited. So that speaks volumes. As far as the Arbitration Act, what I'll say is when you read the interplay that's explained very well and none together with how the arbitration process works and what it's decided to do, which is specifically address a first party right to medical benefits. That's what it's designed to do. There is no precursory effect after that for pursuing the RICO claim. When you read that together with Dean Whitter Reynolds, Supreme Court's made clear the act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. Policy contracts are in fact contracts. Very good. Okay? Thank you very much, Mr. Roberts. Thank you, Judge. And again, let me just reiterate our thanks to counsel on all sides. It was very helpful, your arguments, we appreciate it, and we will take the case to the side. Thank you very much. Thank you.